**SIGNED this 20th day of August, 2009.**

_____
**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**
_____

# United States Bankruptcy Court
### Western District of Texas
### San Antonio Division

| | |
|---|---|
| IN RE | BANKR. CASE NO. |
| JESSE J. MEDINA & PAULA MEDINA | 08-52714-C |
| *DEBTORS* | CHAPTER 13 |

## DECISION ON MOTION FOR SANCTIONS FOR WILFUL VIOLATION OF AUTOMATIC STAY

On July 20, 2009, the court held a hearing on the debtors' motion for sanctions for wilful violation of the automatic stay by Hill Country Electric. Both parties appeared and presented both evidence and argument. The court reset the matter for ruling, to consider the legal issues created by the sometimes troublesome intersection of Texas' scheme of remedies for unpaid subcontractors and the automatic stay of the Bankruptcy Code. This decision disposes of the issue.[1]

---

[1] On the day of the hearing, the creditor filed a response to the motion, together with a motion for annulment of the stay. The court did not hear or consider this newly filed motion, as it was not set for hearing. In all events, the court is inclined to believe that a motion for annulment of the stay, filed as a last minute response to a motion for sanctions based on a stay violation should not be granted in the usual case. After all, the action which has now triggered the motion for sanctions can hardly be erased *ex post*, in an effort to eliminate the basis for the motion for sanctions.

**Background**

Jesse Medina is an electrical subcontractor. Prior to the bankruptcy filing, Medina was working in that capacity on a job site for New Leaf Development, installing electrical in houses in New Leaf's subdivision. Medina failed to pay one of his suppliers, Hill Country Electric, for electrical supplies delivered to the building site on which he was working. HCE sent a Notice of Intent to File Lien to both the owner and the general contractor on the jobs to which HCE had sent materials for Medina to install, pursuant to the "trapping" provisions of the Texas Property Code. *See* TEX. PROP. CODE, §§ 53.056(d), 53.081(a). The Notice also incorporated a Demand for Payment to the owner. *See id.*, § 53.083(a). New Leaf as owner paid HCE in a series of payments over a period of about two months. New Leaf, in its capacity as original contractor, offset the payments New Leaf as owner had made to HCE from post-petition draw requests submitted by Medina (who was continuing to do work on the New Leaf project post-petition). The debtor contended that HCE's actions constituted a violation of the automatic stay, and filed a motion seeking damages.

HCE appeared through counsel and filed a response. It claimed that its efforts to get New Leaf to pay it for the outstanding debt run up by Medina was justified under state law and did not violate the automatic stay. Essentially, HCE maintains that its actions could not be stay violations because HCE only made demand for payment on the owner and the owner elected to pay them. HCE adds that there was certainly no effort to create a lien on the *debtor's* property nor is there any proof that the owner paid HCE monies that could be proven to have been the debtor's (and the burden of so showing, says HCE, was placed on the debtors, not HCE).

2

**Findings of Fact**

The debtor[2] filed this petition on September 17, 2008. Prior to the filing (and after as well) Medina worked as an electrical subcontractor, under an "oral agreement" with New Leaf Homes to install the electrical in a number of homes that New Leaf was building at the time.[3] At least in the months of August and September 2008, Medina bought supplies from HCE on credit, for houses in the New Leaf development. Medina would order enough supplies for approximately a week's worth of work. He and his workers would then install these supplies in the houses he was working on at that time. At the end of the week, he would submit a draw request for that week's work. Following inspection by the contractor, the contractor would then pay Medina's draw request, which of course included an amount sufficient to repay the supplier for the supplies furnished for that week.

Medina received payment pre-petition on draw requests submitted to New Leaf (which would have included a request for reimbursement for supplies purchased on credit from HCE) but did not then pay HCE, even though the draw requests would have included request for payment in the amounts owed HCE. Instead, Medina used the money for other purposes. As a result, HCE was owed $57,285.45 essentially as of the date of filing.[4]

---

[2] Both Jesse and Paula Medina filed this chapter 13 petition. However, only Jesse was involved in this matter. For ease of reference, the court will use "debtor" in the singular to refer to Jesse Medina.

[3] No one contested that Medina was a subcontractor of New Leaf, meaning that New Leaf wore two hats, as it were – owner and original contractor. No one from New Leaf was called as a witness, and only Medina had knowledge of the nature of his relationship with New Leaf, which he characterized at all times in his testimony as that of a subcontractor. No one argued that Medina's relationship was that of an *original* contractor with the *owner* of the project. Had that state of affairs been established by the evidence, the outcome of this case might have been quite different. *See* notes 21, 26 *infra*.

[4] A few invoices were actually dated post-bankruptcy filing. The were listed as follows:

| Job # | Date | Amount |
|-------|---------|-----------|
| 325 | 9/18/08 | $1,242.91 |
| 326 | 9/18/08 | $ 957.21 |
| 333 | 9/18/08 | $ 547.85 |
| 335 | 9/26/08 | $ 127.56 |
| 336 | 9/18/08 | $ 492.63 |

3

The debtor claimed to have notified HCE of the bankruptcy filing within days, though the evidence on the point is uncertain. In all events, on September 22, 2009, HCE sent five Notices of Claim to New Leaf, the owner of the properties being improved (and also the general contractor for most of the properties), as well as to two related entities, MG Ventures, and Vivaldi Inc. (who were the original contractors on a few of the houses), based on the outstanding debt due HCE as of then. The notices were sent pursuant to section 53.056(d) of the Texas Property Code. The Notices incorporated a Demand for Payment as well, as authorized by section 53.083(c) of the Texas Property Code.

New Leaf as owner, in response, sent three checks to HCE to pay off the outstanding invoices of HCE to Medina.[5] The first check, for $29,711.66, was sent on September 26, 2008 and

| 337 | 9/18/08 | $ 494.99 |
| 337 | 9/18/08 | $ 178.73 |
| 350 | 9/17/08 | $ 123.84 |
| 351 | 9/17/08 | $1,511.20 |
| 352 | 9/17/08 | $1,521.74 |
| 356 | 9/18/08 | $1,476.52 |
| Total | | $8,675.18 |

Of this total, one invoice clearly post-dates the notices of claims sent out – $127.56 on job #335. Subtracting that number from the total gives us $8547.62. That number represents post-petition indebtedness, and so should be deducted from the total of $57,285.45. The net pre-petition debt resulting from that subtraction is $48,737.83.

[5] It cannot be ascertained from the checks themselves in what capacity New Leaf Development was acting when it issued checks to HCE. However, the structure of chapter 53 of the Texas Property Code makes it clear that the both the Notice of Claim and the Demand for Payment are issued to the owner, with notice to the original contractor, so that the latter can contest the validity of the claim within the time frame allowed in the statute. See TEX. PROP. CODE, § 53.082 (permitting the original contractor to contest a Notice of Claim within 30 days, or to post a bond). The demand itself is clearly made on the owner, however, and not the original contractor. See id., § 53.083(a). Absent evidence to the contrary then (and no such evidence was offered by the pardon with the burden, the movant), a court is justified in presuming, on these facts, that New Leaf was acting in its capacity as owner when it sent in checks.
        The debtor sought to suggest that the source of funds must have been New Leaf as general contractor, in order to make the further argument that HCE had exerted control over property of the estate (i.e., receivables due Medina from New Leaf as general or original contractor). It even claimed the amount of the first offset (equal to the amount of the first check sent by New Leaf to HCE) to be a receivable on its Schedule B. Saying does not make it so, however, and Medina failed to put on evidence to support its contention.

happened to match the outstanding HCE invoices for the month of August 2008.[6] New Leaf (again as owner) sent HCE a second check for $14,576.33 on November 14, 2008.[7] New Leaf sent a third check for $13,000 to HCE on November 21, 2008, this one for the balance due.[8]

New Leaf was also the original contractor for whom Medina was continuing to do work, and in that capacity, New Leaf recouped the payments New Leaf (as owner) had made to HCE out of draws due to Medina post-petition. The first draw check to Medina showed the setoff of $29,711.66 for payments made to HCE, then paid Medina a net $7,927.57.[9] A second draw check issued on November 14, 2008 reflected a setoff of $7,576.33 to recoup part of what New Leaf had paid HCE for outstanding September invoices. A third check issued on November 21, 2008 reflected a setoff of $7,000, in recoupment of part of its payment to HCE out of Medina's draw for that week. Another check, dated December 12, 2008, reflected a recoupment of $7,000 for payments made to HCE. The last check, dated December 23, 2008, showed a deduction of $6,000. The total setoffs came out to $57,287.99.[10]

There is no indication in the record of any malice on the part of HCE. Indeed, it is not even clear that HCE's contact with New Leaf was directly motivated by Medina's bankruptcy filing. It is also clear from the record, however, that the debtor eventually made demand on HCE to return

---

[6] The check to HCE from New Leaf had the notation "Electrical Materials – August Invoices Due for Jessco Electrical & Lighting." Jessco was Medina's trade name.

[7] This check bore the notation "Electrical Materials – Sept Invoices Due for Jessco Electrical & Light Balance Due = $13000."

[8] The check bore the notation "Electrical Materials – Sept Invoices Due for Jessco Electrical & Light Balance Due = $0.00."

[9] It was this first offset that led the debtor to claim a receivable in that amount on his Schedule B. *See* note 4 *supra.*

[10] There is no explanation for the discrepancy between the amount paid by New Leaf to HCE and the amount that New Leaf recouped from Medina.

5

the monies it had collected from New Leaf (and which New Leaf had then recouped by deducting payments from draw checks issued post-petition), and that HCE refused to do so.

Except for the first check, the draw checks to Medina from New Leaf (from which the deductions were made) were all attributable to post-petition work, and so constituted post-petition property of the estate. The first check, issued September 26, 2008, reflects payment for draw requests that are not specifically identified by date. Thus it is not possible to know whether the source of payment entitlement originated pre-petition. It may not matter, however, as the definition of property of the estate in chapter 13 is broad enough to include these funds as property of the estate, regardless whether the source is pre-petition or post-petition services. *See* 11 U.S.C. § 1306.[11]

Thus, as a factual matter, monies were deducted from property of the estate by New Leaf as general contractor, as reflected on the draw checks issued to Medina, traceable to New Leaf's payment (as owner) of HCE's claims for unpaid supply invoices, most of which were pre-petition obligations. All payments made to HCE came from New Leaf as owner, from funds otherwise due New Leaf as original contractor (though in this case, the two were one and the same). There is no evidence that the monies paid by New Leaf came out of any particular funds identifiable as Medina's. Medina repaid New Leaf involuntarily, however, the result of New Leaf's recoupment from monies otherwise due Medina. Medina urges no action against New Leaf (though it clearly could). It only seeks relief against HCE.

The debtor incurred attorneys' fees of $5,000 in reacting to HCE's actions. That amount in fees, for the services rendered, is reasonable.

---

[11] Section 1306 adds to property of the estate (a) property of the kind specified in section 541 that the debtor acquires after commencement of the case and (b) earnings from services performed by the debtor after commencement of the case. *See* 11 U.S.C. § 1306(a)(1), (2). The draw checks fit easily into at least one of these categories.

6

**Analysis**

This motion seeks damages, including both recovery of funds paid to HCE by New Leaf and attorneys' fees incurred. It is brought under section 362(k), which provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).

At the outset, the court has already concluded (on the record at the close of the hearing) that the factual record does not support a finding of punitive damages. The analysis will thus be limited to whether the case is made for the recovery of actual damages, including costs and attorneys' fees.

To recover, the moving party must demonstrate that the actions of the party accused were a violation of the automatic stay, that the actions were willful, and that the debtor suffered actual damage arising from the actions that were taken. *See Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 355 (5th Cir. 2008); *see also In re Chesnut,* 422 F.3d 298, 302 (5th Cir.2005). In *Chesnut*, the Fifth Circuit held that "willful" in the statute means acting with knowledge of the stay. Said the court:

> A willful violation does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*In re Chesnut*, 422 F.3d at 302; *see also In re Repine*, 536 F.3d 512, 519 (5th Cir.2008).

In this case, the evidence whether HCE did or did not know of Medina's bankruptcy filing when it sent its notices of claim to New Leaf is less than perfect. Hill Country Electric was listed as a creditor on the creditor list filed with the petition, but the clerk of court did not send out formal

7

notice of the filing to creditors until September 28, 2008 (*see* Docket # 10). On the other hand, the motion itself stated that Hill Country Electric "obtained knowledge of the filing of the bankruptcy petition," an assertion that is not denied in HCE's responsive pleadings. The same assertion was repeated during the hearing, and was not denied. The HCE representative was asked some questions about his actions on September 22, 2008, in the context of his knowing about the bankruptcy. The witness did not deny knowing of the bankruptcy, bolstering the inference that HCE did in fact know of the bankruptcy filing when it sent out the notices. The court concludes that HCE knew of the filing of the bankruptcy when it sent out its notices of claim to New Leaf. Thus, the first element of the debtor's action under section 362(k) is satisfied.

The *Chesnut* case next asks whether the action that was done was intended to be done, with knowledge of the bankruptcy. It is not necessary to find that the creditor in fact intended to violate the automatic stay as such – only that the creditor intended to do the actions done, at a point in time when the creditor knew of the bankruptcy. The testimony establishes that HCE intended to collect on the debt owed by Medina, by sending the notices to New Leaf. The second element (intent to act) is thus also satisfied.

No recovery can be had, however, unless HCE's actions violated a provision of section 362(a). Of the subsections of section 362(a) that might apply, the most likely candidates are subsections (a)(1) and (a)(3). Each is briefly summarized below, with regard to how they might apply to the facts of this case. Preliminary to that analysis, it is appropriate to briefly review the Texas statutory scheme that HCE's procedure followed.

1. *The Texas Mechanics' and Materialmen's Lien Statute*

The Texas Property Code, at chapter 53, contains a remedial scheme for contractors, subcontractors, and suppliers. *See* TEX. PROP. CODE, chapter 53 ("Mechanic's, Contractor's, or Materialmen's Liens"). The scheme permits contractors, subcontractors and suppliers to assert a lien on the property of the owner for whom services were performed and with respect to which materials were delivered and incorporated. Associated with the lien (or the threat of a lien) are requirements to set up retainage for the benefit of lien claimants, bonds to indemnify against such liens, and a "trapping" provision that authorizes an owner to withhold funds following notice of a claim. *See id.* Our focus in this case is on this trapping provision, as that was the means by which HCE was paid.

A supplier whose indebtedness has accrued is entitled to assert a lien on the owner's property. *See id.*, §§ 53.021-53.023. The actual lien does not attach until the claimant files a lien affidavit in the proper records, but the lien process involves a series of necessary preliminary steps, including the supplier's sending a "Notice of Claim" to both the owner (whose property is potentially subject to the lien) and the original contractor. *See id.*, § 53.056(b). This Notice may also contain a demand for payment. *See id.*, § 53.083(c). If an owner receives a valid notice pursuant to section 53.056(d) of the Texas Property Code, then the owner is authorized to "withhold from payments to the *original* contractor an amount necessary to pay the claim for which he receives notice." TEX. PROP. CODE, § 53.081(a) (emphasis added).

Thus, one of the preliminary steps to asserting a lien on the owner's property also entitles the claimant to another remedy as well – a trapping remedy. The unpaid supplier is able to "trap" funds otherwise payable to the original (or general) contractor in the hands of the owner. The funds remain trapped until the earlier of (a) settlement, discharge, or indemnification of the claimed

amount, (b) passage of the time for filing an affidavit of mechanic's lien, or (c) satisfaction or release of a filed mechanic's lien. *See id.* § 53.082. As the effect of the trapping is to cut off funds otherwise due to the original (or general) contractor, a copy of this demand for payment must be sent to the original contractor as well. If the original contractor does not dispute the claim, then "he is considered to have assented to the demand and the owner *shall* pay the claim." *Id.*, § 53.083(b). Importantly, the trapping remedy does *not* trap funds in the hands of the original contractor that would otherwise be payable to a subcontractor.[12]

The owner is motivated to both withhold funds from the original contractor upon receipt of a Notice of Claim and a Demand for Payment, and to actually pay off the claim, for two reasons. First, the owner knows that, if the claim is not satisfied, then eventually the claimant will file an affidavit of lien, placing a lien on the owner's property. The cloud on the owner's title would obviously need to be removed before permanent financing could be obtained on the project (or before the project could be sold). Second, the owner also knows that it could eventually become personally liable to the claimant for the amount of the claim once the authorization to withhold has been triggered, even though there was no prior privity of contract between the owner and the claimant. *See* TEX. PROP. CODE, § 53.084(b).[13] In all events, the monies are withheld only from the entity with which the owner does have a contractual relationship – the original contractor.

The original contractor does not have a similar obligation under chapter 53 to withhold

---

[12] Thus, on the facts of this case, though funds otherwise due to the original contractor (New Leaf) were trapped in the hands of the owner (which also happened to be New Leaf), funds otherwise due Medina (as a subcontractor) were not trapped in the hands of the original contractor (New Leaf). Thus, if the original contractor had on hand funds otherwise due and payable to Medina, those funds were not trapped by HCE's Notice of Claim.

[13] Says the statute: "If the owner has received the notices required by Subchapter C ..., if the lien has been secured, and if the claim has been reduced to final judgment, the owner is liable and the owner's property is subject to a claim for any money paid to the original contractor after the owner was authorized to withhold funds under this subchapter." TEX. PROP. CODE, § 53.084(b).

monies from the offending subcontractor in an amount equivalent to the amount of the claim. Nor does it have similar authorization.[14] If it withholds (or offsets) from the subcontractor an amount equivalent to the amount withheld by (or paid by) the owner, it does only other nonstatutory legal rights, such as setoff, equitable subrogation, indemnity, or recoupment.[15] But chapter 53 contemplates a way for an original contractor to protect itself from the possibility that its subcontractors are not paying their workers, subcontractors or suppliers. The original contractor (and subcontractors) may insist as a condition of payment for labor or materials that the contractor or subcontractor certify by affidavit that he has paid each of that person's subcontractors, laborers and suppliers in full. *See* TEX. PROP. CODE, § 53.085(a). A person who even recklessly makes a false or misleading statement in such an affidavit commits a misdemeanor, subjecting the offending party

---

[14] Of course, the original contractor *does* have an independent obligation to withhold monies that come into his hands for the benefit of *unpaid* subcontractors, laborers, and suppliers, under the Texas Construction Trust Fund Statute. *See* TEX. PROP. CODE, §§ 162.001 *et seq.* That statute does not come into play here because HCE (a supplier) *was* paid (by the owner).

[15] *See Lancer Corp. v. Murillo*, 909 S.W.2d 122, 127 (Tex.App. – San Antonio 1995, no writ). Said that court:

> Subrogation is liberally applied and is broad enough to include every instance where one person, not acting voluntarily, pays a debt another incurs. *Argonaut Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 541-42 (Tex.App.-Corpus Christi 1993, writ denied). For example, subrogation has been used by sureties, *Interfirst Bank Dallas*, 774 S.W.2d at 398; guarantors, *Northwest Otolaryngology Assocs. v. Mobilease, Inc.*, 786 S.W.2d 399, 402 (Tex.App.-Texarkana 1990, writ denied); and creditors, *Cannon Ball Truck Stop, Inc. v. Mobil Oil Corp.*, 501 S.W.2d 927, 929 (Tex.Civ.App.-Houston [14th Dist.] 1973, writ ref'd n.r.e.).

*Id.*; *see also Keck, Mahin & Cate v. National Union Fire Ins. Co. Of Pittsburgh, Pa.*, 20 S.W.3d 692, 702 (Tex. 2000) (stating that equitable subrogation is liberally construed, as is the notion of "involuntary payment," a predicate for applying the doctrine of equitable subrogation); *King v. Tubb*, 551 S.W.2d 436, 442 (Tex.Civ.App.-Corpus Christi 1977, no writ) (a cause of action arises when money is paid for the use and benefit of another). The owner was certainly not a volunteer when it paid the claim asserted by HCE in this case – failure to pay could result in a lien being placed on its property. The original contractor was also not a volunteer, given that the amount of money otherwise due him was offset (by statute) by the owner. True, the original contractor did not directly pay HCE, but he directly *repaid* the owner for the owner's paying the claim. Applying the doctrine liberally, the original contractor had at least the legal right to seek recovery from Medina under state law. Indeed, under Texas' Construction Trust Fund statute, had the owner *not* paid HCE, the original contractor would not have been permitted to pay Medina anyway, by virtue of that law's imposition of a species of "trust" on funds in the hands of the contractor when a subcontractor or supplier has not been paid. *See* TEX. PROP. CODE, § 162.001 (construction payments to a contractor are trust funds, § 162.002 (contractor holds trust funds as a trustee), § 162.003 (materialmen are beneficiaries of any trust funds received by a contractor), § 162.031 (misapplication of trust funds subjects contractor to criminal action).

to a fine or incarceration or both. In addition, any person who signs a false affidavit becomes personally liable for any loss or damage. *See id.*, § 53.085(d). Thus, the original contractor has at least some tools with which to protect itself from paying a subcontractor who has not itself paid its supplier – as occurred here.[16]

With this background, we can then turn to consider whether HCE, in employing this scheme, violated the automatic stay. We turn first to section 362(a)(1).

2. *Section 362(a)(1)*

Subsection (a)(1) provides as follows:

> the commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title

11 U.S.C. § 362(a)(1). This subsection stays "a judicial, administrative, or other action or proceeding" *against the debtor* that was or could have been commenced prior to the filing. It also stays "a judicial, administrative, or other action or proceeding *to recover a claim against the debtor* that arose before the commencement of the case. The conduct in this case was not an action *against the debtor* – it was an action against the owner. However, the stay would be violated under this subsection if HCE's conduct in sending the notice of claim and demand for payment to the owner

---

[16] We note this only as a matter of policy here. The action *sub judice* is against the owner, not the contractor. The policy point is that a ruling which permits a recovery by the unpaid supplier against the owner and thereby transfers the risk of loss to the original contractor is consistent with public policy, because Texas' Mechanic's, Contractor's or Materialmen's Lien statute is construed to favor the interests of those entities, who are in the worst position to protect their own interests. They must furnish their goods or services *before* they have a right to payment. The owner should not enjoy a windfall at their expense – hence the lien provisions. *See* Doug Rendleman, *Quantum Meruit for the Subcontractor: Has Restitution Jumped Off Dawson's Dock?*, 79 TEX. L.R. 2055, 2069 (June 2001); *see also* John P. Dawson, *The Self Serving Intermeddler*, 87 HARV. L.REV. 1409, 1451 (1974). The general contractor is the person who *can* protect itself (by assuring that a subcontractor's laborers and suppliers are paid before releasing monies). If it chooses not to, then it has in effect assumed the risk of loss as a consequence. The structure of chapter 53 in fact shifts that risk of loss to the original contractor.

12

counted as an action *to recover a claim against the debtor*.

The phrase "... to recover a claim against the debtor" is somewhat ambiguous. Does this mean actions to recover a claim against the debtor must actually be "actions against the debtor"? Some courts say "yes." *See In re Transportation Systems Intern., Inc*., 110 B.R. 888, 892 (D.Minn. 1990); *see also In re Cincom iOutsource, Inc*., 398 B.R. 223, 226 (Bankr. S.D.Ohio 2008) (actions against corporate parent held not stayed under 362(a)(1), as construed by the Sixth Circuit, as they are not "against the debtor").  But the Second Circuit has wisely observed that this reading creates a problem. *In re Colonial Realty Co.*, 980 F.2d 125 (2nd Cir. 1992). The court said there that actions to recover a claim against the debtor "must encompass cases in which the debtor is not a defendant; it would otherwise be totally duplicative of the former category and pure surplusage. *See id.; see also Borman v. Raymark Industries, Inc*., 946 F.2d 1031, 1036 (3rd Cir. 1991) ("It is an 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative'"); *Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979)). One sort of action that logically fits into this category are garnishment actions, which are not actions against the debtor as such, but are nonetheless actions to recover a claim against the debtor.[17] And the case law has so treated them. *See In re Roche*, 361 B.R. 615 (Bankr. N.D.Ga. 2005) (act of garnishment is the continuation of a judicial proceeding prohibited by § 362(a)(1)); *see also In re Baldwin*, 1996 WL 33401577 (Bankr. C.D.Ill.1996) (noting that 362(a)(1) bars wage garnishments, auto repossessions, mortgage foreclosures, and the like); *In re Banks*, 253 B.R. 25 (Bankr. E.D.Mich. 2000); *In re Galmore*, 390 B.R. 901 (Bankr. N.D.Ind. 2008) (civil contempt action initiated by

---

[17] *See In re Venegas*, 257 B.R. 41, 45 (Bankr. D.Idaho 2001); *Franchise Tax Board v. Roberts*, 175 B.R. 339, 343 (9th Cir. BAP 1994); *see also In re Dungey*, 99 B.R. 814 (Bankr. S.D.Ohio 1989); *In re Mitchell*, 66 B.R. 73 (Bankr. S.D.Ohio 1986); *In re O'Connor*, 42 B.R. 390 (Bankr. E.D.Ark. 1984).

creditor was an action to recover a claim against the debtor); *In re Daniels*, 316 B.R. 342 (Bankr. D.Idaho 2004) (contempt action as part of post-judgment collection action violated stay, because debtor was required to post bond in the amount of the judgment to avoid incarceration); *see also Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210 (9th Cir. 2002) (maintaining an active collection action alone is barred by the statute's prohibition of the "continuation" of judicial actions).[18]

Still, not all actions which have the effect of achieving a recovery on account of a claim that the creditor has against the debtor ought to be stayed. The case law appears to draw the line so as to permit actions which are truly independent, and so do not necessarily exert pressure on the estate or do not necessarily establish a claim against the debtor that would not otherwise be established.

The Fifth Circuit, for example, has held that an action by a party to recover from a third party might be stayed under section 362(a)(1) in the rare and exceptional circumstance that the third party action has the effect of fixing a liability which had not, as of the petition date, been fixed. *See In re S.I. Acquisitions, Inc.*, 817 F.2d 1142, 1148 (5th Cir. 1987) (section 362(a)(1) may apply to stay actions against nondebtor parties "when there is such identity between the debtor and the third party defendant that the debtor must be said to be the real party defendant and that a judgment against the third party defendant will in effect be a judgment or finding against the debtor"); *see also A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986). The Fifth Circuit added that the application of the stay is appropriate "when the liability of the nonbankrupt is not independent of the debtor's liability and a judgment against the nonbankrupt will be binding on the debtor. *Id.;. see A.H. Robins,* 788 F.2d at 999. The *Robins* court gave, as an example, "a suit against a third party

---

[18] In *Leetien*, a creditor initiated a collection suit post-petition. The creditor did not dismiss the collection action for over a month afterward. The bankruptcy court found that the law firm bringing the action unjustifiably delayed dismissing the action, resulting in damages for violating the automatic stay.

who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Id.* The Fourth Circuit recognized the difference between independent liability of a third party (such as, for example, absolute guaranties), and circumstances in which "a debtor and nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law." *Id.* Indeed, the Fourth Circuit was careful to exclude from its holding cases in which the third party is "independently liable" to the creditor. *See id.*

In addition, actions designed merely to maintain or preserve the *status quo* are generally held not to constitute violations of the stay. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 15, 21 (1995); *In re Peters*, 101 F.3d 618, 620 (9th Cir. 1996); *In re Atlas Mach. & Iron Works, Inc.*, 239 B.R. 322, 331 (Bankr. E.D.Va. 1998). *Strumpf*, it will be recalled, held that a bank's "administrative freeze" on a debtor's bank account did not, without more, constitute a violation of the automatic stay.

Section 362(a)(1) has been held *not* to stay actions that have an independent basis for recovery, such as a suit on a guaranty, or a suit on a suretyship bond. *See Veeco Inv. Co., L.P. v. Mercantile Nat. Bank (In re Veeco Inv. Co., L.P.)*, 157 B.R. 452, 454 (Bankr. E.D.Mo. 1993) (no unusual circumstances presented when a guarantor is sued under its guaranty contract and has an independent obligation to the creditor that will be paid with the guarantor's assets, and not from the debtor's assets); *In re S & M Constr., Inc.*, 144 B.R. 855, 862 (Bankr. W.D.Mo. 1992) (actions against non-debtor surety sued on its surety contract and which thereby has obligations that are independent and primary, and not derivative of the debtor, are not stayed); *see also In re Petroleum Piping Contractors, Inc.*, 211 B.R. 290, 305 (Bankr. N.D.Ind. 1997) (automatic stay does not apply to guarantors, sureties, insurers or other persons liable on the debt); *United States v. Wright*, 57 F.3d

15

561, 562 (7ᵗʰ Cir. 1995).

The chapter 53 trapping remedy does not give the unpaid supplier a direct remedy to recover a claim *against* the debtor, though it certainly affords the supplier a remedy *on account of* the monies owed by the debtor. The distinction is important. The trapping action is brought against a third party with no direct contractual duties owed to the subcontractor debtor – the owner – and in that regard is less like a garnishment (or other remedy designed to force the debtor to pay the claim, such as a civil contempt action) and more like an action against an indemnitor. In fact, the trapping remedy in subchapter D of chapter 53 creates a kind of statutory indemnification for unpaid suppliers. The indemnifying party to be sure then has rights of contribution back against the primary obligor – here, Medina. But so do all actions of this nature – suits on indemnity bonds, suits on guaranties, actions to collect on letters of credit.[19] In each case, the action is brought *on account of* the claim owed by the debtor, but does not effectuate (or attempt to effectuate) a recovery against the debtor, either directly or indirectly. Like all such actions, there is an independent basis for recovery against the third party, be it a contract, or a right at common law, or statutory remedy (as here). And, like all such actions, the party paying the claim will, as a result, be entitled to a recovery in the amount of the claim paid. From the point of view of the debtor and the estate, the claim remains unpaid. The identity of the claimant is changed. That is all.

HCE's assertion of a claim against the owner means that the owner traps the funds due the original contractor. That does not, of necessity, mean that the contractor either can or will then withhold funds from the debtor subcontractor – at least not as a matter of law. The original contractor may *choose* to withhold funds, but it is not *required* to do so. It can just as easily assert

---

[19] *See* discussion *supra* at note 14.

16

a claim in the debtor subcontractor's bankruptcy for the amount of the claim originally asserted by HCE against the debtor. Nothing requires (or even permits) the original contractor to withhold payment from the subcontractor.[20] That the contractor here *chose* to do so (by way of offset) is not the fault of HCE, any more than HCE's claim against a surety on a bonded construction project would be deemed an action to recover a claim against the debtor. *See In re Petroleum Piping Contractors, Inc.* 211 B.R. 290, 311 (Bankr. N.D.Ind. 1997). Another way to think about it is that the identity of the claim holder changes as a result of HCE's pursuit of the remedy available under chapter 53 of the Texas Property Code, but the claim itself is unaltered. The same analysis would apply to guarantors who might be called upon to pay on their guaranty obligation, but who are thereafter not necessarily entitled to offset the claim against the debtor post-petition. And so it is that the general contractor, though it might have a common law right of set off or indemnity, is nonetheless stayed by the automatic stay from exercising that right. Thus, HCE's action against the owner pursuant to the notice of claim and demand for payment provisions of the chapter 53 of the Texas Property Code were not actions to recover a claim against the debtor as such, but rather actions to recover from the owner *on account of* a claim against the debtor. The action has a clear independent basis, much like actions on surety bonds, or guaranties (or even letters of credit), and so is not stayed by the prohibition in section 362(a)(1) of actions to recover a claim against the debtor.[21]

---

[20] *See generally* Philip Dale Mockford, *The Use of Setoff in Bankruptcy to Resolve Conflicting Claims to Construction Contract Funds Covered by Texas Mechanic's and Materialman's Liens*, 18 TEX. TECH. L.REV. 917, 948-957 (1987). Mr. Mockford makes the point that having a right to setoff and exercising that right are not the same thing – the latter may violate the automatic stay even though the right itself is preserved. *See id.*, at 957.

[21] The court emphasizes here that this holding applies only to actions by a subcontractor, laborer, or supplier involving a defaulting *subcontractor* who has filed for bankruptcy, against the *owner* pursuant to Subchapter D of chapter 53 of the Texas Property Code. It is, of course, premature to rule on facts not before the court, but it is important to emphasize the narrowness of the ruling here. It would not be appropriate to apply this ruling to the use of the chapter 53 remedies when

3. *Subsection (a)(3).*

This provision stays "any act to obtain possession of property of the estate or of property from the estate, or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The essential prerequisite is that there must be identifiable property of the estate. *See In re Mirant Corp.*, 440 F.3d 238, 252 (5th Cir. 2006) (finding that a debtor's interest in a contract for the future purchase of electric power was property of the estate, and so sheltered from cancellation by this section); *In re Chesnut*, 422 F.3d 298, 302 (5th Cir. 2005) (noting that, by negative implication, this subsection does not stay acts to obtain property that is *not* property of the estate). Here, HCE contends that its actions could not be construed to be an effort to obtain possession of property of the estate, or to obtain possession of property from the estate, or to exercise control over property of the estate, in that HCE sent its notices not to Medina but to New Leaf, in its capacity as owner. And New Leaf, recognizing its personal liability as a consequence of section 53.083 of the Texas Property Code, wrote a check out of its own funds to HCE. Thus, says HCE, it was the owner's property, not the debtor's property, that HCE sought to obtain. True enough, New Leaf, in its capacity as original contractor, promptly recouped the money it was "out" as a result of New Leaf's having paid HCE in its capacity as owner. And sure enough, the recoupment came out of monies New Leaf as original contractor owed Medina for work done after the time frame in which the HCE claim had accrued.[22] But the funds expended by New Leaf were not specially segregated or designated for payment to Medina (at least the evidence did not so establish).

The Ninth Circuit ruled that the "exercise control" language in section 362(a)(3), added by

---

it is the *general contractor* who files for bankruptcy. *See* note 26 *infra.*

[22] And in so doing, arguably violated the automatic stay. *See In re Operation Open City, Inc.,* 170 B.R. 818, 824-25 (S.D.N.Y. 1994).

18

amendment in 1984, was intended to broaden the scope of the original language of that section so that it would proscribe the "knowing retention of estate property." *In re Del Mission Ltd.*, 98 F.3d 1147, 1151 (9th Cir. 1996). The court explained that the added language was intended to relieve the estate of the added burden and expense of pursuing turnover actions to recover estate property in the hands of third parties, so that the essential scope of the "exercise control" language is essentially the same as the scope of the estate's right to seek turnover of property from third parties, under section 542. *See id.*; *see also Knaus v. Concordia Lumber Co. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989) (duty to turn over property of the estate arises upon filing, and the failure to do so constitutes a prohibited attempt to exercise control); *In re Sharon*, 234 B.R. 676, 683 (6th Cir. BAP 1999).

HCE was not in possession of property of the debtor as of the filing, and it was not in possession of property of the debtor after New Leaf paid it pursuant to section 53.083 of the Texas Property Code. Had HCE not made its demand for payment, and the debtor had instead made demand for turnover of funds from New Leaf in its capacity as owner, its turnover action would have failed. *See In re Barrett*, 39 B.R. 792, 794-95 (Bankr. D.Minn. 1984) (general rule is that subcontractor has no right of recovery from the owner absent a contractual relationship); *In re T. Brady Mechanical Services, Inc.*, 133 B.R. 441, 446 (Bankr. N.D.Ill. 1991) (under Illinois law, a subcontractor has no right of action against the owner of the property).[23]

A similar circumstance is presented with respect to letters of credit, especially those that are secured by property of the debtor. Courts have held that presentation of a letter of credit does not violate section 362(a)(3). *See Lower Brule Const. Co. v. Sheesley's Plumbing & Heating Co., Inc.*,

---

[23] We can analogize to cases involving payment bonds. Bankruptcy courts have concluded that the estates of subcontractors and suppliers do not have a property interest in payment bonds or surety bonds. *See In re Petroleum Piping Contractors, Inc.*, 211 B.R. 290, 311 (Bankr. N.D.Ind. 1997) (collecting cases).

84 B.R. 638, 644-645 (D. S.D. 1988). The debtor does not have a property interest in the funds that the bank pays to the party presenting the letter of credit.

Here, HCE took no action against any property of the debtor. Instead, it pursued an independent remedy against the owner, available under state law. The owner owes no direct duty to the debtor subcontractor – there is no contractual relationship between subcontractor and owner. HCE's demand for payment, contained in its notice of claim, did not have to be honored by the owner for at least 30 days, during which period the original contractor could have contested the validity of the claim. *See* TEX. PROP. CODE, § 53.083. The statute does not contemplate the subcontractor (the debtor in this case) even being involved in the process. Thus, the debtor had no property rights in any payments the owner might otherwise make to the original contractor – not even if those payments are the source of the original contractor's payments to the debtor/subcontractor. HCE's claim against the *owner* did not require the *original contractor* to then withhold the claimed amount from the monies due to the debtor subcontractor.[24] It cannot be maintained, then, that HCE's demand for payment, sent to the owner, constituted an exercise of control over property of the debtor.[25]

---

[24] The court recognizes that the original contractor might choose to exercise its state-law remedies under any one of a variety of theories to recoup the money it is "out" from the owner – assumpsit, setoff, unjust enrichment, common law indemnification, subrogation, etc. *See* discussion *supra* at note 14. The fact that the original contractor *could* exercise such remedies under state law does not mean that it *must* exercise those remedies. Indeed, the automatic stay would appear to *prevent* the original contractor from affirmatively repaying itself out of the debtor's right to payment. At best, the original contractor might place a "freeze" on those monies, under the authority of *Strumpf*. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), *see also* Mockford, *The Use of Setoff*, *supra* at note 20. There is an insufficient "cause and effect" relationship between these two acts to conclude that HCE's remedies as to the owner ineluctably causes the resulting setoff by the original contractor from the debtor.

[25] The court recognizes that the largest portion of the overall indebtedness accrued where New Leaf Homes, LLC was both the owner and the original contractor. The debtor doubtless maintains that it was New Leaf in its capacity as original contractor that paid the debt to HCE, so that the claim must have been paid out of monies owed to Medina. But that is not accurate. Part D of chapter 53 does not permit demand for payment to be made to anyone other than the owner, though notice is certainly given to the original contractor (to give that party the right to contest the legitimacy of the claim). Thus, New Leaf when it paid the claim was necessarily wearing its "owner" hat. New Leaf then immediately doffed its "owner" hat and donned its "original contractor" hat, and set off the payment New Leaf had made to HCE in its owner capacity against the

\

# Conclusion

For the reasons stated, the court concludes that a supplier's assertion of the remedies available under sections 53.056, 53.081, 53.082, and 53.083 of the Texas Property Code, to recover a debt owed by a subcontractor or supplier does not violate the automatic stay.[26] If there is no stay violation, then of course there is no basis for damages under section 362(k). An order will thus be entered denying relief to the moving party.

### # # #

---

indebtedness New Leaf owed Medina in its original contractor capacity. New Leaf could as easily have chosen, in response to HCE's claim, to contest the claim (wearing its original contractor hat) and to hold the funds (in its owner capacity) until the dispute was resolved. Certainly no automatic stay issues would then have arisen – not even if New Leaf had elected to place a "freeze" on Medina's receivable until the conflict was resolved. *See Strumptf*, *supra* at note 24. HCE could not control which of those alternatives New Leaf chose to pursue, and so cannot be held to be liable for the course of action New Leaf chose to pursue.

[26] The analysis is likely to be very different if the claim in question is not derivative, as here, but a direct claim against the original contractor. If the original contractor is the debtor, then the trapping remedy *would* violate the automatic stay. This is so because the action would function as a garnishment of funds otherwise due to be paid to the original contractor, an exercise of control over property of the debtor/original contractor. *See* 11 U.S.C. § 362(a)(3); TEX. PROP. CODE, § 53.081 (if an owner receives proper notice, then "the owner may withhold *from payments to the original contractor* an amount necessary to pay the claim").